AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Northern District of California

UNDER SEAL

FILED
AUG 30 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| United States of America<br>v.<br>Nicole Suno,<br><br>*Defendant(s)* | ) ) ) ) ) ) ) | Case No.<br><br>3:19-71421 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __April 5, 2018__ in the county of __San Francisco__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form: ___/s/___
WILLIAM FRENTZEN
Assistant United States Attorney

*Complainant's signature*
Janette Spring, Special Agent - FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/30/2019

*Judge's signature*

City and state: San Francisco, California

Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Janette Spring, Special Agent with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION

### A. SYNOPSIS

1. I submit this affidavit in support of a criminal Complaint for YI WEN SHIH, also known as NICOLE SUNO ("SUNO").

2. There is probable cause to believe SUNO, while employed as a marketer at a home health agency in Alameda, California, accepted kickback payments in exchange for patient referrals, in violation of 42 U.S.C. § 1320a-7b(b), the anti-kickback act.

3. As part of this investigation, the Agents have obtained information from the cooperation of an FBI cooperating witness ("CW-1")[1] and evidence obtained by an FBI undercover employee ("UCE").

4. An identified co-conspirator introduced SUNO as an individual willing to accept kickbacks in exchange for patient referrals.

5. During the course of this investigation, the UCE held multiple in-person audio and video recorded conversations with SUNO in 2018, in which SUNO receives kickback payments in exchange for the referral of patients and likewise facilitates the payment of kickbacks to co-conspirators.

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services. However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation. As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased. These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA. A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship. CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer. The CW-1 later falsely denied having possessed false identifying documents when interviewed by immigration officers. Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture. The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status. After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual. To my knowledge, those threats were never carried out. CW-1 is not currently the subject of any pending criminal charges.

## B. BACKGROUND OF LEGAL FRAMEWORK AND INVESTIGATION

1. Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b). The relevant language of the statute is listed below. In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care.[2]" FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice. Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services. The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring. Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.[3]

2. An undercover operation was selected as the means of investigating kickbacks. From training and experience, the investigators understood that health care providers and HHAs shrouded their activities in secrecy. Typically, health care providers were given kickbacks in the form of cash payments made in closed door meetings between themselves and HHA representatives. Some used bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually non-existent, services. Given the expected closed nature of the transactions and

---

[2] "Kickbacks Among Medicaid Providers", Senate Report 95-320, 1977.

[3] In fact, throughout the course of the investigation, four of the targets, while negotiating kickback payment amounts, discussed similar "longevity" bonuses. UCE agreed to these bonuses or entertained further discussion to potentially identify any such referrals by proactively identifying at-risk patients. During the course of the investigation, no such longevity bonus referrals were made to the UCO.

2

the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective. An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments

3. Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area. One of the two agreed to serve as a cooperating witness ("CW-1"). CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks. UCE often communicated with targets in furtherance of the UCO while in San Francisco. The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

4. In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required. For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks. Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial introductions and to allowing the UCO to expand. The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies. Further, the care provided by the vetted HHA could be monitored and reviewed.

5. In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO. The FBI investigation was partly based upon analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA

Alpha did not fall into the profile of a likely kickback offender. Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations. Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints[4], which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency. Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care.[5] During the course of the UCO, there was one complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare through the duration of the UCO. During the course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA Alpha. At no time during their meetings with CW-1 and/or UCE did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been received. Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

## C. AGENT QUALIFICATIONS

---

[4] An anonymous complaint filed in 2016 alleged a durable medical equipment kickback scheme, which was closed due to insufficient information. In 2015, Medicare closed a patient allegation of false billing by HHA Alpha after a review of documents provided by HHA Alpha justified the billing.

[5] Only three patients out of 129 interviewed by FBI complained and the complaints consisted of (1) early discontinuation of treatment, (2) a nurse should have shown up more often, and (3) physical therapy should have been longer. Of all patients referred to HHA Alpha by targets of the investigation during the UCO, the FBI was unable to interview 31 patients due to the patients passing away in hospice care or because the patients could not be located – generally international patients. As to those patients, no complaints regarding patient care were ever filed against HHA Alpha.

11. I am a Special Agent of the FBI and have been so employed for approximately three years. I am currently assigned to the Complex Financial Crime Squad of FBI's San Francisco Field Division. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime. I have received specialized training in health care fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims. I have participated in the execution of various arrests and search warrants in which business and personal documents, bank records, computers, and other evidence of fraud and other crimes have been seized.

12. In the course of this investigation and my investigation of other health care fraud schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3) read interviews and other reports written by other law enforcement officers; and (4) become familiar with the manner and means by which health care fraud schemes are operated including violations of 42 U.S.C. Section 1320a-7b and 18 U.S.C. Section 371.

13. This affidavit is intended to show merely that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Where excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

### B. COMPLAINANT

6. SUNO, legal name YI WEN SHIH, is a 38 year old female believed to reside in San Leandro, California. SUNO was a marketer for Asian American Home Care, Inc. ("ASIAN AMERICAN"), a home health care agency located in Alameda, California.

7. While employed as a marketer at ASIAN AMERICAN, SUNO accepted kickback payments in the form of cash from UCE and CW-1 in exchange for the referral of home health and/or hospice patients to HHA Alpha.

## C. STATUTE VIOLATED

8. **Title 42, United States Code, Section 1320a-7b(b)(1)(A)**, in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly, or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

## II. PROBABLE CAUSE

### A. BACKGROUND

9. Through CW-1's position at HHA Alpha, CW-1 became familiar with VINEETA SINGH ("SINGH"), Director of Social Work for Hayward Hills Health Care Center, a skilled nursing facility, located in Hayward, California. CW-1 was aware she was taking kickbacks for patient referrals, which were likely paid by AMITY HOME HEALTH CARE, INC. ("AMITY"), an HHA located in Hayward, California. During the UCO, CW-1 and UCE met with SINGH who agreed to accept kickback payments in exchange for the referral of patients. SINGH also agreed to refer physicians and health care professionals to CW-1 and UCE who were willing to participate in a similar patient referral kickback scheme.

10. Through CW-1's position at HHA Alpha, CW-1 also became familiar with SUNO. During the UCO, SINGH also identified SUNO as a healthcare professional willing to accept kickbacks in exchange for patient referrals.

### B. SINGH ARRANGES THE KICKBACK SCHEME BETWEEN SUNO, CW-1, AND UCE

11. On January 6, 2018, CW-1 spoke with SINGH via telephone. This conversation was recorded. SINGH indicated she spoke with SUNO regarding SUNO referring a patient for home health care. SUNO was a marketer for ASIAN AMERICAN, a home health agency which SINGH indicated did not accept patients who lived in the territory SUNO's patient referral lived in. SINGH told CW-1 "So she has a Medicare but the Medicare lives in Antioch." CW-1 indicated HHA Alpha could accept the patient and asked SINGH, "How do you wanna work with her?" in reference to involving SUNO in

the kickback scheme. SINGH explained SUNO would give her the patient referral, and SINGH would then give the patient referral to HHA Alpha. SINGH stated: "Okay, this is how it is, okay." … "I'll be giving it to, she'll be giving it to me, I'll give it to you." SINGH went on to refer SUNO to CW-1 as someone who would be interested in the kickback scheme. SINGH and SUNO were likely already sharing kickbacks for patient referrals based on SINGH's statements: "I think she's a person, she, you know, like how you guys do it right away kind of thing." … "Yeah. So, I have to, well, her and I do share." CW-1 agreed to meet with SINGH on the following Tuesday to pay her a kickback for SUNO's referral. SINGH stated: "Because I have to tell her that ah, so you'll bring it on Tuesday? You'll pay up on Tuesday, right?" CW-1 confirmed: "I can, I can stop by and see you Tuesday, yes." SINGH then responded: "Okay, let me call her."

### C. SUNO ACCEPTS KICKBACK PAYMENTS IN EXCHANGE FOR THE REFERRAL OF PATIENTS

12. On January 8, 2018, CW-1 met with SINGH and paid her $500 in cash for SUNO's patient referral. SINGH was going to share the kickback payment with SUNO.

13. On February 7, 2018, SUNO called CW-1 and stated "I talked to [Individual 1], VINEETA [SINGH], she's like, you need to reach out to [CW-1]". This conversation was recorded. SUNO expressed interest in participating in the kickback scheme and stated "I only consider you guys and um, AMITY." CW-1 began to explain UCE and CW-1's business plan and arranged a time to meet to discuss the plan in more detail.

14. On February 12, 2018, CW-1 met with SUNO to discuss the kickback scheme. SUNO told CW-1 she was thinking about leaving her job at ASIAN AMERICAN to which CW-1 responded "… Vineeta [SINGH] was saying and [Individual 1] was saying put her on board. We still don't have the ownership of the company [HHA Alpha] 'til October." SUNO later stated "You know, I was thinking between then we could start like working together." SUNO went on to express her interest in working with CW-1 prior to October. CW-1 explained the business plan and kickback scheme further. SUNO proposed: "So maybe I'll just send you, like, referrals and then see how we work well together." … "For referral basis, and then once October, and then we can talk." CW-1 asked SUNO what payment amount she would expect per patient referral: "Okay, and how do you wanna work before that, on a

7

referral basis, what would you be expecting on that?" CW-1 and SUNO agreed to the kickback amounts. The following is an excerpt of the discussion:

> SUNO: Uh, I saw, like industry standards like 500.
>
> CW-1: Yeah.
>
> SUNO: Yes.
>
> CW-1: So that's uh, home health.
>
> SUNO: Yeah.
>
> CW-1: And if you have hospice?
>
> SUNO: 700
>
> CW-1: Okay, that's fair enough.

15. Between April 2 and April 4, 2018, SUNO referred a Medicare patient to HHA Alpha. Additionally, SUNO attempted to refer at least two more patients to HHA Alpha during this time frame. An excerpt of the text message exchange between CW-1 and SUNO in regards to these patient referrals is below:

| Speaker | Statement | Additional Explanation[6] |
|---|---|---|
| SUNO: | Hi [CW-1], morning! Did you open the case? Was everything okay? | SUNO asks CW-1 whether the patient she sent to HHA Alpha was admitted for services. |
| CW-1: | I believe so. I will Chk [check] once I am in the office. Thank you again and we will meet soon | |
| SUNO: | Great! | |
| CW-1: | Can we meet Thursday so I can thank you in person | CW-1 tells SUNO that he/she will pay SUNO a kickback (i.e. "thank you in person") for the referral. |
| … | | |
| SUNO: | Just sent you one. DC next Tuesday | SUNO tells CW-1 that she sent another patient referral. "DC" means discharge. |
| SUNO: | I have two more for you. | SUNO tells CW-1 that she will send two more patient referrals. |

---

[6] The "Additional Explanation" columns in this affidavit provide my summary opinion and/or explanation of the adjacent text in the "Statement" column. My summary opinion and/or explanation is based on my training and experience of the criminal statutes violated and of the UCO.

8

| CW-1: | Hi, Nicole hold off on sending new referrals at the moment. Under survey now. Thx | CW-1 tells SUNO that HHA Alpha is under an administrative review (i.e. "survey") and to hold off on referring any additional patients in connection with the kickback scheme. |

    16. On April 5, 2018, UCE and CW-1 met with SUNO. The meeting was audio and video recorded. UCE discussed with SUNO, the possibility of her recruiting physicians to participate in the kickback scheme and the risk associated with their participation in the scheme. SUNO expressed understanding the risk and admitted she had accepted kickbacks before but not for the referral of home health patients. At the end of the meeting, UCE paid SUNO $500 in cash for the referral of one Medicare patient to HHA Alpha. Below is an excerpt of the aforementioned exchange:

    UCE:  So if you think that there is people that would work with us, um, you know with your introduction, um, for now what I can do is, I mean you were kind enough to give us one [patient referral], we are happy to, to do that, anyone you bring on board, we can give you something [kickback payment] for that as well.

. . .

    SUNO:  Well, about the doctor, how much share do they get?

    UCE:  So it's up to the doctors, we've been doing this, ah, a couple of ways, most of our doctors have done, just taking envelopes [cash kickbacks] as we go, which is fine.

. . .

    SUNO:  But what if, like I bring in a doctor, in the picture.

    UCE:  Mmhmm.

    SUNO:  And then how do I, how do, someone like me work together with the doctor? How do I, would I pay him?

. . .

    CW-1: We could pay him.

. . .

    UCE:  See, you're more of like, a relationship manager for us.

    SUNO:  Right.

9

UCE: Making them feel comfortable, making them feel relaxed. Maybe the first time or two, since April of maybe the first time, faxing in referrals and we just an envelope [cash kickback]. It's all good. once they realize it's really easy and low key, then, we've been doing this last year, so we've had a full year of this. Almost everyone is, maybe the second time, and then after that they're just show up and we thank them and hand them

. . .

UCE: So if you, so if you're giving us [patient referrals] directly, we can take care of you [pay a kickback] directly for that because that's a one by one kind of thing.

SUNO: Yeah.

UCE: And every doctor you bring in, we can give you a percentage, based on that. So, you know that's, that's fine. Whichever way you wanna do it but if you wanna start out as you go, no problem.

. . .

UCE: We, we get that this can be scary and it should be scary. I mean anyone who doesn't have a little bit of concern, I'm worried about them 'cause they're just not, they're being stupid. Yeah, um so, if anytime you change your mind, decide this isn't for you or you're worried, just say so. We'll shake your hand and say thank you. We're, we're low, low pressure. Low, low pressure and if anytime you change your mind is good, and anyone who doesn't at least think about it, it's just not paying attention, right. I mean, there is, there is some risk right.

CW-1: Right.

UCE: And, and we don't, we don't want to lie to people and say oh, it's all fine, it's all fine. Yeah there is some risk. There's some risk.

CW-1: Yeah.

SUNO: Good point.

. . .

UCE: Makes sense?

SUNO: Yeah.

UCE: Okay. So do you have any questions about what we do and how we work?

SUNO: No, I will just think about who I can connect you guys with.

UCE: Excellent. That is excellent. Perfect.

CW-1: Sounds like a plan.

. . .

UCE: Alright, so, I have something [an envelope of cash] for you because you gave us one [patient referral]. And would you like me to do it [payment for the referral] in your car, or do it here? Or what would you like?

SUNO: We can do it here.

UCE: This is five hundred.

SUNO: [SUNO takes the envelope] Thank you. Yes.

UCE: Okay. Thank you ma'am.

SUNO: I've been taking all kinds of these envelopes but not from home health.

17. Following this meeting, SUNO attempted to refer physicians to UCE and CW-1 as part of the patient referral kickback scheme. Additionally, SUNO referred CAROLINE PRESCOTT-CLARK, Director of Marketing for an assisted living facility in Hayward, California, to UCE and CW-1 to participate in the kickback scheme.

18. During the course of the UCO, SUNO met with CW-1 and/or UCE on at least five occasions, during which SUNO accepted cash in exchange for the referral of a Medicare patient to HHA Alpha and as a retainer for future patient referrals. In total, SUNO accepted $3,500 in cash from CW-1 and/or UCE and attempted to refer three patients to HHA Alpha.

### III. PROBABLE CAUSE FOR THE VIOLATION

#### A. TITLE 42 UNITED STATES CODE, SECTION 1320a-7b(b)(1)(A), THE ANTI-KICK BACK STATUTE

19. Title 42, United States Code, Section 1320a-7b(b)(1)(A), in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any

kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

20. Based on all of the foregoing, probable cause exists to believe that SUNO accepted kickback payments from UCE that were intended to induce SUNO to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

21. Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by SUNO for home health or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(1)(A).

22. Therefore, there is probable cause to believe that patient referrals sent to HHA Alpha by SUNO in exchange for cash payments from UCE meets the definition of a kickback payment and violates anti-kickback statute.

## IV. CONCLUSION

23. Based on the foregoing, there is probable cause to believe SUNO accepted kickback payments in exchange for patient referrals, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A).

//
//
//
//
//
//
//
//
//
//
//
//

## V. REQUEST FOR SEALING

24. Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect. Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related documents be sealed until the further order of this Court.

_____
Janette Spring, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this 30th day of September, 2019.

_____
HON. JOSEPH C. SPERO
United States Chief Magistrate Judge